**Erwin W. DAVIS, Plaintiff,**

v.

**AMERICAN MOTOR SALES CORPORATION, formerly known as Nash-Kelvinator Sales Corporation, Defendant.**

No. 9748.

United States District Court
W. D. Missouri, W. D.

June 5, 1956.

Bruce M. Forrester, Kansas City, Mo., Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel, for plaintiff.

Richard S. Righter, Robert D. Youle, Kansas City, Mo., Lathrop, Righter, Blackwell & Parker, Kansas City, Mo., of counsel, for defendant.

RIDGE, District Judge.

Both plaintiff and defendant have moved separately for judgment in their favor under Rule 56, F.R.Civ.P., 28 U.S. C.A., supported by an agreed stipulation of facts and certain documents, the admissibility and relevancy of which have been agreed to by the parties. Since there is no genuine issue as to any material fact, we proceed to consider and rule said motions.

The uncontroverted facts which are pertinent to the proper consideration and determination of the instant motions are as follows: Plaintiff was a franchised Nash Dealer for 1953. On January 5, 1953, plaintiff entered into a written agreement with defendant corporation, which agreement (Exhibit B) was designated "Nash Dealer Franchise Agreement," and incorporated by reference and made a part thereof a separate written instrument (Exhibit C) known as "Dealer Franchise Provisions, Form Number NOD 2246–C." Under the provisions of this latter agreement with defendant, plaintiff was entitled to and did purchase automobiles from defendant under the terms and conditions of its "Price List Bulletin—Dealer," (Exhibit D). The "Price List Bulletin—Dealer" stated that when plaintiff had purchased his last car of the then current series (1953), defendant would pay to plaintiff a graduated quantity bonus computed on the total of each series of automobiles which plaintiff had purchased.

After plaintiff had made his last purchase from defendant of the 1953 series of automobiles, plaintiff alleges there was due him under the terms of his agreement with defendant a graduated quantity bonus of $12,186.36, of which $8,896.36 has been paid by defendant. The difference is $3,290, which is the basis of this controversy. It is stipulated that $3,290 is the amount of the graduated quantity bonus payable upon the purchase of 69 automobiles here in issue, the purchase price of which was financed for plaintiff by Commercial Credit Corporation.

Defendant alleges that it does not owe a bonus to plaintiff on these 69 cars, since in June, 1953, Commercial Credit Corporation repossessed said cars; and that after plaintiff ceased business, by means of a separate option agreement between defendant and Commercial Credit Corporation, defendant re-purchased from the latter all 69 cars. As a result of such re-purchase, plaintiff's account with defendant was thereupon debited for $3,290, the amount of the bonus previously credited plaintiff for the purchase of these 69 cars.

The sole issue for determination is: Did the original transaction between plaintiff and defendant relating to said 69 cars constitute a "purchase" thereof by plaintiff from defendant within the meaning of the "Dealer Franchise Agreement" plaintiff had with defendant and the "Price List Bulletin—Dealer" supra, so as to enable plaintiff to receive a bonus of $3,290, irrespective of the fact that defendant re-purchased the cars in question from Commercial Credit Corporation, after the latter had repossessed the same from plaintiff? In considering this issue, if we remove the ambiguous allusions counsel apparently perceive in the business transactions between plaintiff and defendant and which they have clothed in considerable legal verbiage and theory, and view such relations pragmatically, we will see that there are four separate agreements here involved: First, there is the contract plaintiff had with defendant for plaintiff to purchase

cars from defendant and thereby receive a quantity bonus discount (Exhibits B, C and D); Second, the "Authorization for Signature to Expedite Wholesale Financing," (Exhibit O) from plaintiff to Commercial Credit Corporation, the same being a power of attorney; Third, the "Purchase Money Chattel Mortgage Agreement" (Exhibit M) between plaintiff and Commercial Credit Corporation, whereby the latter financed the plaintiff in his purchase of automobiles; Fourth, the "Wholesale Drafting Instructions Agreement" (Exhibit N) between Commercial Credit Corporation and the defendant which notified the defendant that plaintiff was financed in his purchase of cars by Commercial Credit Corporation and if it became necessary for the latter party to repossess any cars from the plaintiff, then defendant was granted a wholesale re-purchase option at a price not to exceed the net invoice cost to the plaintiff, including transportation costs.

There are no equities, whatsoever, involved in the determination of this cause. The parties are bound by the agreements which they entered into. Under the contract existing between plaintiff and defendant, and the subsequent agreements and transactions involving Commercial Credit Corporation, of which defendant was not only cognizant, but in which it participated, it would be incongruous to hold that plaintiff was not a purchaser of the 69 automobiles here considered. Plaintiff purchased these cars under an arrangement called a "floor plan," a trade practice commonly used by automobile dealers, whereby title passes from the manufacturer to the financial institution extending the dealer credit, and thereafter to the dealer, himself. Plaintiff, although not receiving the actual bill of sale, is recognized as the purchaser of such automobiles, and that he has a sufficient interest therein to execute chattel mortgages and mortgage notes thereon, so as to finance the purchase of the cars, themselves, from defendant. After dichotomizing all the business transactions involved in the purchase of these 69 automobiles, the proper relation of the interested parties is as follows: Defendant manufactured and sold the automobiles to plaintiff, and was immediately paid for said automobiles; plaintiff purchased or bought the automobiles from defendant and Commercial Credit Corporation financed the plaintiff's purchase and accepted chattel mortgages on the automobiles in question as security for the loan. Commercial Credit Corporation by no extension of legal theory can be considered by these transactions the purchaser of these automobiles.

The fact that these cars were financed by Commercial Credit Corporation in no way delimits plaintiff's right to be considered the purchaser thereof. Nor can that fact delimit his right to receive a bonus thereon, since it is stated in the stipulation of facts that, "Defendant has never differentiated between cash and financed sales in setting up and computing the 'graduated quantity bonus' account for plaintiff Erwin Davis." (III(c), Stipulation.)

The contention of defendant that it was obligated to pay bonuses only on those cars actually sold to consumers, not on those purchased by plaintiff, is without merit. Notwithstanding the fact that if a dealer is to stay in business he must sell the automobiles to the public, nowhere is the word "sell" or the concept "sell to the consumer" used in any of the agreements or communications between plaintiff and defendant, limiting a dealer's right to the quantity bonus discount. Quite to the contrary, in fact, the "Price List Bulletin—Dealer" states, "When the dealer shall have *purchased* his last series cars from zone, he will be paid by zone the following graduated quantity bonus." The bulletin reiterates that, "It is understood that the above shall apply only on the Dealer's own *purchases* of current series cars directly from the zone." (Exhibit D.) Furthermore, in the "Confidential Dealer Report" concerning the "Graduated Bonus Plan" the following was set forth: "As of 5–31–53 we have credited your Graduated Bonus account with $11,868.00 due to

your *purchase* from this zone of the following net quantities of 1953 series cars: * * * " (Exhibit E), (emphasis ours).

The fact that these 69 cars were repossessed by Commercial Credit Corporation and subsequently re-purchased by defendant does not nullify plaintiff's right to receive this bonus. The "Price List Bulletin—Dealer" only qualifies the conditions under which a bonus may be received by holding that "new cars purchased and resold or traded to any Dealer other than an authorized Nash Dealer, shall not be considered in determining graduated quantity bonus." The repossession by Commercial Credit Corporation does not fall within the ambit of this limiting clause since the cars in question were neither "resold" nor "traded", and Commercial Credit Corporation in no way can be deemed a "Dealer" within the terms of said agreement.

Granted that after re-purchasing the cars, defendant will perhaps have to pay another bonus to a subsequent Dealer who purchases said cars, this factor does not affect plaintiff's rights under the contract to receive the bonus. Defendant's re-purchase of the automobiles in question was inextricably a voluntary and volitional act which defendant was under no obligation to consummate. This purchase was made under and pursuant to a wholesale re-purchase option existing between defendant and Commercial Credit Corporation. (Exhibit N.) This agreement was an option, nothing more, and the exercising of this option by defendant cannot subsequently defeat the rights which inured to plaintiff before the option was exercised. After Commercial Credit Corporation repossessed the cars and before defendant exercised its option, Commercial Credit Corporation was "stuck" with 69 new cars, constituting a considerable investment. It could have sold these cars on the open market and had it done so, there could be no question about defendant's obligation to pay a bonus thereon. The fact that the defendant voluntarily relieved the plight of Commercial Credit Corporation does not remove any rights, liabilities, or duties existing between the plaintiff and defendant, nor does it affect that relationship one iota. Commercial Credit Corporation, though holding a power of attorney from Davis, was not authorized thereunder to execute any re-purchase agreement such as it consummated with defendant. Its power thereunder was limited to "execute, sign and deliver wholesale title retention or lien instruments * * * and other documents in favor of Commercial Credit Corporation," not a re-purchase agreement if it repossessed any automobile from Davis. Under Exhibit M, Commercial Credit Corporation was obliged to sell repossessed cars at "public or private sale," but it was not contemplated that any such sale thereof would in any wise affect plaintiff's original purchase of such cars from defendant, or his right to a bonus for such original purchase.

In view of the fact that plaintiff purchased 69 automobiles from defendant for which a quantity bonus of $3,290 became due and owing to plaintiff, and no evidence has been adduced to defeat plaintiff's interest in such bonus, summary judgment is granted in favor of plaintiff and against defendant in the amount of $3,290.

It is so ordered.